FILED

2006 Feb-06  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
TERRY LEE PASSMORE SWANN, as    }
Administrator of the Estate     }
of MERRI ELIZABETH PASSMORE,    }
deceased,                       }      CIVIL ACTION NO.
                                }      03-AR-0011-S
        Plaintiff,              }
                                }
v.                              }
                                }
SOUTHERN HEALTH PARTNERS,       }
INC.,                           }
                                }
        Defendant.              }
```

**<u>MEMORANDUM OPINION</u>**

Before the court is the motion for summary judgment filed by
defendant, Southern Health Partners, Inc. ("SHP").  SHP moves for
summary judgment on both claims asserted by plaintiff, Terry Lee
Passmore Swann ("Swann"), as administrator of the estate of Merri
Elizabeth Passmore, deceased ("Passmore").  During January of
2001, SHP was the contract provider of medical services for
Blount County, Alabama, and Passmore was in the care and custody
of SHP until her release on a recognizance bond and subsequent
transfer to another medical facility.  Swann's first complaint
asserted claims against SHP, Georgette Denney ("Denney"), the
nurse who attended Passmore, Dr. Lennie Gibson ("Gibson"),[1] the
attending physician, and Larry E. Staton ("Staton"), the Sheriff
of Blount County.  The action against Staton was dismissed on

---

[1] Dr. Gibson was improperly identified in Swann's first complaint as "L.
Gewin, M.D."

qualified immunity grounds with the court's memorandum opinion and order of April 22, 2003.  On May 7, 2003, the action against Denney and Gibson was dismissed because of lack of service. Swann filed an amended complaint on May 22, 2003.  The court dismissed the action on July 28, 2003 for failure to satisfy the heightened pleading standard of 42 U.S.C. § 1983.  Swann appealed the court's order to the Eleventh Circuit, which reversed and remanded, holding that the heightened pleading standard is inapplicable in as much as SHP is not entitled to claim qualified immunity.  Swann sought leave to file a third amended complaint. His motion was granted, and he filed his present complaint against SHP on December 9, 2004.

Swann now brings two claims, although he places them in one count.  First, he claims that SHP had a policy or custom of deliberate indifference to inmates' medical needs, proximately causing a deprivation of Passmore's rights under the Eigth and Fourteenth Amendments.  Second, Swann again invokes the Eighth and Fourteenth Amendments, asserting that SHP failed to adequately train its medical personnel.  For the reasons that follow, summary judgment is due to be granted in full.

2

### *Summary Judgment Facts*[2]

Blount County, Alabama, contracted with SHP to provide the medical care required by inmates in the custody of the county. According to the health services agreement between SHP and Blount County, SHP assumed the duty to provide medical services to all inmates whom it determined to require such care.  The contract stipulated that SHP will bear the full price of regular medical services administered within the jail.  SHP was likewise responsible for all medical services provided outside the jail up to an annual aggregated sum of $45,000, and for one half of such costs between $45,000 and $60,000 per year.  The County bore all costs above $60,000.

Denney was a licensed practical nurse ("LPN") employed by SHP and assigned to work in the Blount County Jail during January of 2001.  During that same time period, Gibson was a contracted physician with SHP and served as the jail physician in Blount County.  On January 3, 2001, Passmore was arrested and booked into the jail.  Upon her admission, a medical screening was performed wherein she reported a history of asthma, heart

---

[2] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, this statement of facts includes both undisputed facts and, where there is a dispute, the facts according to the non-movant's evidence, and the legitimate inferences therefrom.

problems, high blood pressure, a psychiatric disorder, and seizures.  Passmore's prior physician confirmed a history of back pain and hypertension, but denied knowledge of any seizures. Denney examined Passmore that night, noting that she was alert and oriented, although upset that she had been arrested. Passmore's pulse and respiration were normal but her blood pressure was slightly elevated, which was consistent with her anxiety.  Later that night, the jailers contacted Denney to report that Passmore had complained of a headache.  Denney ordered tylenol.

On the afternoon of the next day, January 4, 2001, Passmore told the jailers that she had vomited several times, although the officers found no evidence of vomit.  Passmore was given tigan for her nausea, and her vital signs were taken.  No further action was taken at that time.

On the morning of January 5, 2001, Passmore filled out a medical request form asking for blood pressure medication and an antidepressant, and describing her various ailments: cold or flu-like symptoms, vomiting, diarrhea, ear pain, and sore throat. Denney saw her that morning, again noting that Passmore was alert and oriented, and again taking her vitals.  Passmore reported that she was dizzy, and mentioned that she had not urinated in five days.  She had not previously complained of urinary problems.  Denney examined Passmore and noted that she showed no

4

signs of edema but had mild bladder distension. Passmore reported that she had similar symptoms on previous occasions when she had bladder infections.  Denney then consulted Gibson, describing Passmore's symptoms and Denney's examinations of her. Based on this information, Gibson diagnosed Passmore as having either a viral or bacterial infection, and prescribed two antibiotics (bicillin and erythromycin), two medications designed to combat cold and flu symptoms (sudafed and antivert), an antidepressant (elavil), and a pain medication (pyridium).  Denney encouraged Passmore to drink plenty of water and to notify Denney if her problems persisted.

Denney examined Passmore the next morning, January 6. She was alert and oriented and her vitals were normal.  There were still no signs of edema and bladder distention had subsided. Passmore no longer complained of diarrhea or vomiting, but maintained that she had not urinated.  Denney ordered her to be placed in a holding area so that she could be monitored more closely, and a short time later noticed that Passmore was wearing a maxi pad.  There was no blood on the pad and no other evidence of vaginal bleeding.  Denney performed a catheterization for urinalysis, but did could not obtain enough urine.  Denney therefore performed a stick test, which was positive for blood and leucocytes.

Denney then moved Passmore to the medical isolation unit,

told her to flush fluids, and not to flush the toilet.  Passmore summoned Deeney at 10:30 a.m. to tell Denney that there was urine in the toilet but that it was not Passmore's.  Denney was skeptical of this statement as the jailers had a policy of cleaning all cells prior to transferring inmates, and they were confident that they had done so on this occasion.  Denney's suspicion was also fueled by Passmore's claim that she was menstruating when she was not bleeding, and her purported history of seizures which had not been confirmed by her previous physician.  At noon, Passmore vomited a small amount of undigested food and liquid.  She claimed to be dizzy, but decided to lie down rather than take a tigan suppository.  Denney checked on her at 2 p.m., when she no longer complained of nausea or vomiting.

Denney again saw Passmore at 8:30 a.m. on January 7.  Denney had been advised by the jail officers that Passmore had vomited throughout the night.  Passmore was alert and oriented, her skin was warm and dry, and the bladder distension was further diminished.  Passmore confirmed that she had vomited and had diarrhea twice during the night.  She had not, however, followed Denney's orders not to flush the toilet, and was reminded to do so in the future. Passmore claimed that she still had not urinated, so Denney performed another catheterization, this time obtaining enough urine to be sent off for laboratory testing.  At

Passmore's request, Denney moved her back to her regular cell, but with the promise that she would notify the officers if she had diarrhea, vomited, or continued to be unable to void.  Denney heard nothing further from Passmore that day.

On January 8, 2001, Denney received the lab report of Passmore's urinalysis. Passmore had tested positive for protein, occult blood, epithelial cells, white blood cells, and bacteria. Denney faxed this report to Gibson along with a cover letter apprising Gibson of Passmore's current condition.  After reviewing these materials, Gibson diagnosed her as having a bacterial urinary tract infection, and prescribed bactrim, an antibiotic.  Passmore, who reported urinating three times that day with no vomiting or nausea, was also advised to continue flushing fluids.

At 10:00 p.m., an officer summoned Denney to Passmore's cell because she was incoherent.  The officers showed Passmore's cell to Denney, where there were signs of dry fecal matter on the bed and around the toilet.  Denney examined Passmore in the medical cell at 10:15 p.m.  Passmore was sluggish but not in acute stress and able to communicate.  She complained of "cotton mouth" but no pain, her vital signs were acceptable, and her skin was warm and dry.  Passmore had taken her elavil at 6:00 p.m., so this medication partially explained her sluggishness.

While Denney examined Passmore, the jailers conducted a

search of Passmore's cell, finding an unidentifiable rock-like substance and a cigarette lighter.  Denney was unable to determine whether Passmore had consumed any of the substance.[3] Believing Passmore to be under the influence of illicit drugs, Denney placed her in a holding area with orders to the officers that she be contacted immediately if there were any changes in Passmore's condition.

At 9:00 a.m. on January 9, 2001, Denney examined Passmore, who was disoriented and unable to communicate.  Her skin was cool to the touch and Denney noted edema for the first time.  Because any drugs from the night before should have been out of her system at this time, Denney realized that Passmore's condition was serious.  She paged Gibson at 9:20 a.m., and he called back at 9:45 a.m., ordering Passmore to be transferred to the emergency room.  Denney informed the hospital of Passmore's condition and history, and arranged to have her transported and released on bond.  Passmore was moved to Medical Center East in Birmingham, Alabama, where she went into a coma and died on January 25, 2001.

### Analysis

I.   Deliberate Indifference to a Serious Medical Need

It is understood that deliberate indifference to a prisoner's

---

[3] This object was later tested by the Alabama Department of Forensic Sciences and determined not to contain any prohibited substance, but this testing was not completed until August 8, 2001.

medical needs falls within the Eighth Amendment's proscription against "cruel and unusual punishments." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976).[4]  However, for an entity such as SHP, liability does not attach solely because a constitutional violation occurred.   To impute liability to SHP under 42 U.S.C. § 1983 for the actions of Gibson and Denney, Swann must prove (1) that those individuals committed a constitutional violation, and (2) that a causal link between that violation and SHP's policies or customs exists.[5]   If Swann has failed to show that a constitutional violation occurred, then the court need not

---

[4] Swann invokes both the Eighth and Fourteenth Amendments to the United States Constitution.  However, it is clearly established that the Eighth Amendment only becomes relevant after a prisoner has been tried and convicted. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 n.5 (11th Cir. 1985). Therefore, because Passmore was a pretrial detainee, the applicable constitutional provision is the Fourteenth Amendment's guarantee of due process. *Id.*  However, this distinction will not affect the court's analysis. The Eleventh Circuit has held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985).  For that reason, the two provisions are interchangeable, and the court need not distinguish between each line of case law.

[5] Although the protection of the Eighth Amendment may attach to a private corporation contracted by the state to provide medical services to inmates, *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259 (1988), mere *respondeat superior* liability is insufficient to establish liability under 42 U.S.C. § 1983. *E.g.*, *Howell v. Evans*, 922 F.2d 712, 724 (11th Cir. 1991), *vacated as moot*, 931 F.2d 711 (11th Cir. 1991), *reinstated by unpublished order as noted*, 12 F.3d 190, 191 n.1 (11th Cir. 1994).  For SHP to be held liable as a state actor, Swann must prove that the violation resulted from an official policy or custom of SHP, *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997), or that the actions of the individual with "final authority on policy" amounted to deliberate indifference. *Howell*, 922 F.2d at 724.  The court is skeptical of Swann's ability to prove causation, as the record tends (1) to show that the official policy of SHP was to treat its patients effectively, (2) to be devoid of evidence of *any* custom of SHP vis-a-vis its patients, and (3) to show that neither Gibson nor Denney were the final policymakers for SHP.  Nevertheless, the court reserves judgment on this issue as it is not essential to the resolution of SHP's summary judgment motion.

reach the issue of whether an SHP policy or custom caused the medical professionals' behavior. *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).

The *prima facie* case for deliberate indifference contains objective and subjective components. A plaintiff must first prove that the prisoner had an objectively serious need for medical attention. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). SHP does not deny that Passmore suffered from a serious medical condition. For the subjective analysis, a plaintiff must prove that the defendant acted with deliberate indifference to that need. That is, a plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Swann seeks to prove deliberate indifference through what he alleges is a custom or policy of "delaying or completely failing to provide medical care for inmates until the inmates reached a level of illness which required that they be sent to an emergency room at a local hospital, after the inmates had been release [sic] on their recognizance." A close reading of the applicable precedent, however, exposes the weakness in Swann's claim: he has not presented any evidence which would allow a reasonable jury to conclude that Gibson and Denney's conduct was more than negligence. This determination is necessarily fact-specific, and for that reason there is no single

formula guiding the court's analysis.  Nevertheless, a survey of Eleventh Circuit case law reveals that the summary judgment record does not support Swann's claim for deliberate indifference to medical needs.

The paradigmatic deliberate indifference claim is that the defendants had knowledge of the need for medical attention and yet intentionally refused to provide any treatment. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).  There is a sharp contrast, however, between the cases in which the defendants knowingly refused treatment in the face of a patient's deteriorating condition, and those in which the plaintiff alleges merely that the defendant should have known that the patient's condition *could* deteriorate. *Compare McElligott*, 182 F.2d at 1259 (holding that doctors were deliberately indifferent to an inmate's pain when they repeatedly denied him pain medication or any new treatment despite obvious signs that his current treatment was not successful, and then failed to transfer him to a hospital or give him additional treatment even after learning that he had previously been tentatively diagnosed with cancer), *and Carswell v. Bay County*, 854 F.2d 454, 457 (11th Cir. 1988) (holding that defendants were deliberately indifference to an inmate's medical needs when they repeatedly ignored and refused to treat the inmate with any medication other than milk of magnesia, even as he became so emaciated that a public defender remarked that the inmate "looked

11

like a concentration camp victim"), *with Howell*, 922 F.2d 712, 721
11th Cir. 1991) (holding that a doctor's actions may have been
negligent but were not deliberate when he failed to anticipate or
respond adequately to an inmate's severe asthma attack, and was
unreachable during the day when he was needed).  The instant case
does not fit the mold of deliberate indifference outlined in
*McElligott* and *Carswell*.  Gibson diagnosed Passmore as having
either a viral or bacterial infection, and treated her accordingly.
There is no evidence that Gibson or Denney knew that this course of
treatment would not be effective until immediately before Passmore
was transferred to the hospital, and both testified in affidavits
that they were never aware of additional treatment which Passmore
needed but which was refused to her.  At worst, their conduct is
analogous to *Howell* in that they did not anticipate that her
condition would deteriorate so rapidly on the night of January 8,
2001.  Such an error might or might not be medical malpractice, but
it is not deliberate indifference of a constitutional proportion.
No reasonable interpretation of the summary judgment evidence
supports the conclusion that Gibson or Denney intentionally refused
to treat Passmore even though they knew she needed treatment.

Where an inmate has received *some* treatment, courts are
hesitant to find that deliberate indifference has occurred. *Waldrop
v. Evans*, 871 F.2d 1030, 1025 (11th Cir. 1989).  Gibson and Denney
could have been deliberately indifferent if they intentionally

12

delayed necessary treatment for "non-medical reasons." *Ancata*, 769 F.3d at 704; *see also Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (holding that it is deliberate indifference to delay unnecessarily treatment of an inmate's broken foot).  The only evidence offered by Swann relevant to this type of deliberate indifference is the contract between SHP and Blount County. Swann asks the court to extrapolate from the allocation of costs in the contract that two medical professionals deliberately chose to delay Passmore's treatment until they could transfer her to another facility so that SHP would enjoy greater profits on the health services agreement.  There is absolutely no evidence to corroborate this accusation.  In fact, the record shows that at every stage in Passmore's treatment, Gibson and Denney responded in the way which they believed to be appropriate. The only decision which could potentially be construed as an intentional delay of treatment occurred when Denney sent Passmore back to her cell on the night of January 8, 2001.  However, the "tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994).  Although Passmore appeared to be seriously ill when Denney saw her that night, Passmore's medication explained her grogginess, and the jailers discovered a rock-like substance and a cigarette lighter in her jail cell.  The harsh reality of health care provision in a county jail dictates

13

that nurses and doctors are exposed to the effects of illegal drugs on a recurring basis.  Confronted with what appeared to be evidence of recent drug use and a patient manifesting symptoms consistent with drug use, Denney made a reasonable medical decision to send Passmore back to her cell for further observation and to examine Passmore the next morning when the drugs should have worn off. That Denney's decision was ultimately proven to be incorrect does not mean that she intentionally delayed Passmore's treatment. Denney "may not have prescribed further treatment soon enough," but such a delay is not actionable. *Howell*, 922 F.2d at 721.  No reasonable jury could infer deliberate delay under these circumstances.

Another formulation of deliberate indifference recognized by the Eleventh Circuit is a logical corollary to the intentional choice to deny treatment entirely: the intentional "choice of an easier but less efficacious course of treatment." *Waldrop*, 871 F.2d at 1035.  A number of Eleventh Circuit cases have cited *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974), for this proposition. *See, e.g.*, *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988). In *Williams*, the Second Circuit held that an inmate stated a claim for deliberate indifference when he alleged that his physicians threw away the portion of his ear which had been cut off by another inmate, choosing instead to suture the stump rather than attempting to sew on the severed portion. 508 F.2d at 544.  No similar

14

allegation is made by Swann.  The court is unable to find any evidence in the record of an instance where Denney or Gibson knew the proper way to proceed, but nevertheless took a less effective course of action because it was easier.  In this context again, Swann's bare allegations have no support in the record.  Swann can only attack the reasoned medical decisions of Gibson and the SHP staff--a futile endeavor in a deliberate indifference case.

The final variant of deliberate indifference recognized in the Eleventh Circuit holds health care professionals liable for treatment that, while not intentionally indifferent, is "so cursory as to amount to no treatment at all." *Ancata*, 769 F.2d at 704. Such "grossly inadequate" treatment transpired in both *McElligott* and *Carswell*.  In *McElligott*, the doctor refused to provide his patient with any stronger medication than tylenol, pepto-bismol, and bentyl (an anti-gas medication) to treat severe pain, the root of which was later determined to be terminal cancer.  In *Carswell*, the inmate's weight dropped from 145 to 93 pounds in less than three months while his doctors provided him little treatment other than milk of magnesia and minimal medical attention.  In the instant case, the LPN administered nine different medications at the attending physician's direction, and examined Passmore on at least ten occasions.  Swann offers proof only that Gibson and Denney should have provided *different* treatment, not that their treatment was grossly inadequate.  Whether an incorrect diagnosis

amounts to deliberate indifference rather than mere negligence is properly explored by expert testimony, as the conduct must be "evaluated according to professional standards." *Waldrop,* 871 F.2d at 1035; *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).  Swann has presented no expert testimony on this issue, while SHP has provided affidavits from two medical professionals indicating that Gibson and Denney were not negligent, much less deliberately indifferent.  The evidence in the summary judgment record cannot reasonably be construed to support a jury verdict on deliberate indifference.  Summary judgment must be awarded to SHP on this ground.

## II.  Inadequate Training

Although Swann claims that SHP failed to adequately train its medical personnel, his complaint does not allege any specific facts regarding the training SHP provides, nor has Swann introduced relevant evidence on the subject into the summary judgment record. Furthermore, Swann does not address this issue in his response to SHP's brief, even though SHP advanced in its motion for summary judgment the argument that Swann had not proved the "limited circumstances" which would allow that claim to survive summary judgment.  It is well-settled in the Eleventh Circuit that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *see also Road Sprinkler Fitters*

*Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).   Swann's abandonment of this claim is transparent; the court will not fight Swann's losing battle for him.   Summary judgment is appropriate on this claim.

### *Conclusion*

In accordance with the foregoing, the court will by separate order grant SHP's motion for summary judgment in full.

DONE this 6th day of February, 2006.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE